IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA GRAVELINE and MARK GRAVELINE, husband and wife,<br><br>    Plaintiffs,<br><br>    v.<br><br>SELECT COMFORT RETAIL CORPORATION, a Minnesota Corporation,<br><br>    Defendant. | 2:11-cv-01214-GEB-KJN<br><br>ORDER DENYING SELECT COMFORT'S DISMISSAL MOTION |

Defendant Select Comfort Retail Corporation ("Select Comfort") moves under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for dismissal of the following claims in the First Amended Complaint ("FAC"): Plaintiff Sandra Graveline's negligence and strict products liability claims and Plaintiff Mark Graveline's loss of consortium claim. The Gravelines oppose the motion.

**I. LEGAL STANDARD**

Decision on Select Comfort's Rule 12(b)(6) dismissal motion requires determination of "whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief." Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., 637 F.3d 1047, 1054 (9th Cir. 2011) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

When determining the sufficiency of a claim, "[w]e accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party[; however, this tenet does not apply to] . . . legal conclusions . . . cast in the form of factual allegations." Fayer v. Vaughn, 649 F.3d 1061, 1064 (9th Cir. 2011) (citation and internal quotation marks omitted). "Therefore, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." Id. (citation and internal quotation marks omitted); see also Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555) (stating "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do'").

## II. THE GRAVELINES' ALLEGATIONS

This case concerns personal injuries Sandra Graveline allegedly suffered from exposure to mold growing in the Gravelines' Sleep Number® mattress, which was designed and manufactured by Select Comfort. (Pls.' First Am. Compl. ("FAC") ¶¶ 3 & 5.) The Gravelines allege that "[i]n 2007 . . . , Sandra Graveline's health suddenly began to deteriorate, leaving her with less and less energy and never enough breath." Id. ¶ 18. "When [Sandra Graveline] sought medical help in 2007, the doctors were unable to . . . determine where in her body the problem . . . was located. . . . Only later would they determine she was suffering from a pulmonary disorder caused by her chronic exposure to mold." Id. ¶ 19.

"[T]he doctors . . . first diagnosed and treated her for a heart condition." Id. ¶ 21. In 2009, "a cardiologist was finally able to rule out a cardiology problem and determined [her] problems were instead pulmonary related." Id. ¶ 23. "[Diagnostic] tests started with the assumption that [she] was suffering from chronic obstructive pulmonary disease and then, more specifically, pulmonary arterial hypertension. Yet, despite all of these tests, her pulmonary doctor remained unable to determine what was causing [her] health problems[.]" Id. ¶ 25.

"[O]n or about April 15, 2010[,] . . . Mark Graveline removed the cover from the Gravelines' Sleep Number® bed and discovered . . . mold . . . growing under the foam pad which sits on top of the impermeable air chambers." Id. ¶ 33. "[T]he largest [mass] of mold colonies was in an area under the portion of the bed where Sandra Graveline slept." Id. "Mark Graveline arranged to have a mold expert conduct laboratory tests . . . [on] samples from the [mattress]." Id. ¶ 38. "These tests confirmed the presence of extremely high concentrations of Aureobasidium [mold] growing on the foam pad taken from the Graveline[s'] Sleep Number® bed[.]" Id. "The Aureobasidium had slowly begun to grow . . . within a year after [the Gravelines] purchased th[e] bed in 1999, and it [grew] there for more than 10 years[.]" Id. ¶ 15.

"On or about May 4, 2010, on the recommendation of both [Sandra] Graveline's doctor and the mold expert, the Gravelines purchased and installed a . . . HEPA air filter[.]" Id. ¶ 40. "After installing the HEPA Filter, and after . . . remov[ing] the moldy Sleep Number® bed, [Sandra] Graveline's breathing problems began to improve." Id.

The Gravelines allege "the mold problem in the Sleep Number® bed results from a design which can entrap moisture without adequate air

3

1  circulation." Id. ¶ 55. The Gravelines also allege that Select Comfort
2  was "well aware of the mold-inducing defect inherent in the design of
3  their Sleep Number® bed[,]" since it received customer complaints,
4  responded publicly to news articles about mold in Sleep Number® beds,
5  and modified the design of the Sleep Number® bed to address the mold
6  problem. Id. ¶¶ 42-43, 47-48, 50 & 53. The Gravelines further allege
7  that "[g]iven [Select Comfort's] knowledge of the mold problem and the
8  risk it posed, . . . [Select Comfort] had a duty to recall the Sleep
9  Number® beds or otherwise notify past purchasers, including the
10 Gravelines, of the potential risk and danger of mold." Id. ¶ 58. The
11 Gravelines also allege "[Select Comfort] had a duty to warn the
12 Gravelines . . . of the inherent defect in their Sleep Number® bed when
13 the Gravelines purchased [it]." Id. ¶ 78.

14      Sandra Graveline alleges in her negligence claim that "[Select
15 Comfort] breached [its] duty . . . when [it] sold the Gravelines a
16 negligently designed Sleep Number® bed, without any warnings or
17 instructions to open and inspect [the mattress] regularly." Id. ¶¶ 65-
18 66. Sandra Graveline alleges in her strict products liability claim that
19 "the Sleep Number® bed was inherently defective because, in the course
20 of regular and normal use, the design of the Sleep Number® bed cause[s]
21 it to collect and entrap moisture on the air chamber surface and the
22 immediately adjacent foam"; and "[Select Comfort was] already well aware
23 of the design defect in th[e] Sleep Number® bed" when it sold one to the
24 Gravelines. Id. ¶¶ 74-78. Mark Graveline alleges in his loss of
25 consortium claim that Select Comfort's "wrongful conduct has deprived
26 [him], and will continue to deprive him, of Sandra Graveline's support
27 and companionship[.]" Id. ¶ 98.
28 //

# III. DISCUSSION

## A. Negligence and Strict Products Liability Claims

### 1. Causation

Select Comfort argues the Gravelines "fail[] to adequately plead causation above a speculative level, as is required for both of [Sandra] Graveline's tort claims." (Def.'s Mot. to Dismiss ("Mot.") 10:7-8.) Select Comfort specifically argues "the FAC is devoid of any allegation that [Sandra] Graveline was ever diagnosed with an allergy to mold . . . and that the mold in her bed caused her symptoms." Id. 10:14-17. Select Comfort also argues "[the] temporal gap of approximately nine years between when [the Gravelines] purchased their bed and the onset of Sandra Graveline's symptoms . . . negates any inference of a cause and effect relationship between the purchase of the bed and Sandra Graveline's injury." Id. 12:1-4.

However, the FAC contains the following allegations:

> When [Sandra Graveline] sought medical help in 2007, the doctors were unable to . . . determine where in her body the problem . . . was located. Discovering Sandra Graveline's heart was enlarged, her doctor first thought the problem was in her heart. Only later would they determine she was suffering from a pulmonary disorder caused by her chronic exposure to mold.
>
> There was nothing in the Gravelines' life or lifestyle that helped explain the sudden onset of Sandra's mysterious health problems. They were living in the same house they had lived in for years, doing the same things they had done for decades. The Gravelines kept a clean house and did not have any other significant or ongoing mold problems in their home during this period.
>
> . . . [W]ith the benefit of hindsight, it is clear other circumstances were pointing at the bed. In the years between losing her health (2007) and discovering the mold (2010), Sandra Graveline noticed the longer she was awake and sitting in her living room or kitchen, the better she seemed to feel as the day passed. . . .

5

> . . . [B]oth Sandra and Mark Graveline were also ravaged by unexplained rashes and skin disorders beginning in late 2008. Scientific research has confirmed chronic human exposure to Aureobasidium can also cause various skin disorders.
>
> . . . Once the moldy Sleep Number® bed was removed from their bedroom, both Mark and Sandra Graveline's rashes cleared up completely.
>
> Sandra's pulmonary condition also improved slightly but distinctly after the moldy Sleep Number® bed was removed from their bedroom in April of 2010. . . .
>
> . . . [Laboratory] tests confirmed the presence of extremely high concentrations of Aureobasidium growing on the foam pad taken from the Graveline[s'] Sleep Number® bed; the same mold was also determined to be growing on the outer surface of the impermeable air chambers.
>
> According to O.S.H.A. and other scientific research, Aureobasidium operates as an allergen, an irritant and a cause of hypersensitivity pneumonitis. Chronic exposure to Aureobasidium can also cause other pulmonary diseases and disorders, as well as various skin disorders. . . . [T]he [pulmonary] symptoms posed by Sandra Graveline[] . . . correspond to her chronic exposure to Aureobasidium. Conversely, no doctor, laboratory test or other analysis, over the course of three years, has ever identified any other potential cause for the sudden and complete destruction of Sandra's health.
>
> On or about May 4, 2010, on the recommendation of both [Sandra] Graveline's doctor and the mold expert, the Gravelines purchased and installed a . . . HEPA air filter. . . . After installing the HEPA Filter, and after the Gravelines removed the moldy Sleep Number® bed, [Sandra] Graveline's breathing problems began to improve.

(FAC ¶¶ 19, 20, 28-31 & 38-40.) A reasonable inference can be drawn from these allegations that Sandra Graveline's exposure to the Aureobasidium in the Gravelines' Sleep Number® bed caused her alleged injuries.

   **2. Statute of Limitations**

Select Comfort argues "[Sandra Gravelines'] claims are clearly time-barred by the California two-year limitations period for personal

6

1 injuries[, since she] . . . alleges she began experiencing symptoms in
2 2007." (Mot. 15:14-16 (citing Cal. Civ. Proc. Code § 335.1).) Select
3 Comfort also argues the discovery rule, "which delays the accrual of a
4 cause of action . . . until a plaintiff either becomes aware of the
5 injury and its cause or could have discovered the injury and [its] cause
6 through reasonable diligence[,]" does not delay the date on which Sandra
7 Graveline's claims accrued. (Mot. 15:19-16:6 (citing <u>Jolly v. Eli Lilly</u>
8 <u>& Co.</u>, 44 Cal. 3d 1103, 1110-11 (1988)).) Select Comfort further argues:

> the FAC does not contain any facts showing how [the
> Gravelines] could not, with reasonable diligence,
> have "discovered" the mold in their bed and pieced
> together the same allegations they now make[,] but
> within the limitations period[, since] . . . the
> bed was in their home and under their control.

(Mot. 16:9-12.)

14 The Gravelines counter that they "filed [their complaint]
15 within one year after discovering the mold in their mattress" and they
16 "have adequately alleged the facts necessary for application of the
17 discovery rule." (Opp'n 18:8-14.) The Gravelines also argue:

> Because of the latent nature of th[e] defect (and
> because of [Select Comfort's] failure to warn or
> recall their Sleep Number® bed), the Gravelines had
> no reason to suspect [Sandra Graveline's] injuries
> were caused by a large colony of mold hidden within
> the otherwise apparently 'harmless' mattress they
> had be[en] using for years.

(Opp'n 18:24-19:2.)

23 The Gravelines allege that for three years, Sandra Graveline's
24 doctors misdiagnosed her as having heart and pulmonary conditions, after
25 which Mark Graveline discovered the mold in the Gravelines' Sleep
26 Number® bed on April 15, 2010. (FAC ¶¶ 19, 21-27, & 33-34.) A reasonable
27 inference can be drawn from these allegations that the Gravelines did
28 not have reason to suspect that Sandra Graveline's injuries were caused

7

by an alleged design defect that caused mold growth in their bed until Mark Graveline discovered the mold; therefore, Select Comfort has not shown that Sandra Graveline's tort claims are time-barred.

**C. Unreasonably Dangerous Product**

Select Comfort argues "Plaintiffs . . . fail[] to plead facts demonstrating the Sleep Number® bed is an unreasonably dangerous product requiring a warning." (Mot. 16:16-18.) Select Comfort further argues the Gravelines "provide absolutely no factual basis for th[eir] theory" that "the bed has an inherent design defect and has a propensity to grow mold." Id. 16:24-17:2.

Under California law,

> [t]o establish a failure to warn claim, a plaintiff must prove that the manufacturer had a duty to warn of the dangers arising from a foreseeable use of the product and that the breach of that duty was the proximate cause of the plaintiff's injuries. When a manufacturer is or should have been aware that a product is unreasonably dangerous absent a warning and such warning is feasible, the manufacturer will be held strictly liable if it fails to give an appropriate and conspicuous warning.

Maneely v. Gen. Motors Corp., 108 F.3d 1176, 1179 (9th Cir. 1997).

The Gravelines allege in their FAC:

> [T]he mold problem in the Sleep Number® bed results from a design which can entrap moisture without adequate air circulation. That design provides for a frame which supports internal air chambers. These chambers are separated by and covered with foam. This foam is in turn encased within another layer of foam, all of which is enclosed within a mattress cover. The combination and arrangement of these materials constitutes the design defect.

(FAC ¶ 55.) The Gravelines also allege:

> [This design] combined with the consumers' foreseeable pattern of use—eight hours of foam compression coupled with moisture accumulation at the dark foam/rubber surface interface, followed by 16 hours of drying within the porous foam—[creates] an ideal mechanism for drying, launching and

>       distributing mold spores into the surrounding
>       bedding and air.
>
>       . . . By sleeping between sheets and under blankets
>       tucked in on three sides, and most open in the area
>       around her shoulders, neck and face, the bedding
>       operated, with each bodily movement, to gently stir
>       and push airborne spores around [Sandra
>       Graveline's] body out towards her face where her
>       regular inhalation carried them, breath after
>       breath, into her lungs.

(FAC ¶¶ 45-46.) A reasonable inference can be drawn from these allegations that the Sleep Number® bed has an inherent design defect that produces mold, which "is unreasonably dangerous absent a warning." Maneely, 108 F.3d at 1179.

Select Comfort also argues the Gravelines' "allegations that Select Comfort knew that its beds were unreasonably dangerous . . . [do not have] any basis or support in fact." (Mot. 18:8-13.) The Gravelines counter that Select Comfort "ignores the news stories" attached to the FAC and "other allegations about [specific] consumer[] complain[ts.]" (Opp'n 16:19-26.)

The Gravelines allege in the FAC that Select Comfort was "well aware of the mold-inducing defect inherent in the design of their Sleep Number® bed" "[b]y at least 1995," since "Select Comfort was receiving a growing number of complaints from consumers who were finding mold[.]" (FAC ¶¶ 42-43 & 53.) The Gravelines also allege that "[b]y 2004, Select Comfort's stock was being hammered by . . . television and newspaper stories in Minnesota about moldy Sleep Number® beds[,]" and that Select Comfort responded to these television and newspaper stories by "belittl[ing] the problem" and "claiming that mold could develop in any type of mattress and was not common." Id. ¶¶ 47-48. The Gravelines attached to their FAC examples of specific consumer complaints and news articles, which they characterize in their FAC as supporting their

9

allegation that Select Comfort knew its beds were unreasonably dangerous. The Gravelines further allege Select Comfort redesigned the sidewalls of the Sleep Number® mattress in 1995 and the mattress cover in 2005 in "an ongoing attempt" "to find a solution to the persistent mold problem." Id. ¶¶ 42-43 & 50. A reasonable inference can be drawn from these allegations that Select Comfort had knowledge of the alleged design defect.

**D. Loss of Consortium**

Select Comfort argues "causation is a required element of a claim for loss of consortium, and . . . Plaintiffs have failed to adequately plead it." (Mot. 19:7-9.) "[A] loss of consortium cause of action has four elements: (1) a valid and lawful marriage between the plaintiff and the person injured at the time of the injury; (2) a tortious injury to the plaintiff's spouse; (3) loss of consortium suffered by the plaintiff; and (4) the loss was proximately caused by the defendant's act." Hahn v. Mirda, 147 Cal. App. 4th 740, 746 n.2 (2007) (citation omitted).

The Gravelines' FAC contains the following allegations regarding Mark Graveline's loss of consortium claim:

> Before [Select Comfort's] conduct caused Sandra Graveline to suffer the loss of her good health in 2007, Sandra Graveline took care of the Gravelines' household on a daily basis. She prepared their meals, did the grocery shopping, washed dishes, washed their clothes, dusted and vacuumed their home and managed all of the other usual housekeeping tasks.
>
> . . . For the last four years, and for the foreseeable future, Mark Graveline has been required to complete the daily chores Sandra had performed, in addition to the other tasks he had been doing before.
>
> Prior to losing her breath, strength and energy in 2007, Sandra Graveline had also cared entirely for herself. Now, she lacks the energy to care entirely

>for herself and, thus, in addition to performing all of the household work Sandra had done, Mark Graveline's life is further consumed by the need and struggle to serve Sandra as a caregiver when she lacks the energy to care for herself.
>
>[Select Comfort's] wrongful conduct has deprived Mark Graveline, and will continue to deprive him, of Sandra Graveline's support and companionship, and has thereby damaged [Mark] Graveline[.]

(FAC ¶¶ 94-98.) A reasonable inference can be drawn from these allegations that Select Comfort caused the damages alleged in Mark Graveline's loss of consortium claim.

Select Comfort also argues "Mark Graveline's claim for loss of consortium is time-barred" "[f]or the same reasons" it contended Sandra Graveline's claims are time-barred. (Mot. 19:25-26.) However, Select Comfort has not demonstrated that this claim is time-barred.

### IV. CONCLUSION

For the stated reasons, Select Comfort's motion is denied.

Dated: May 21, 2012

_____
GARLAND E. BURRELL, JR.
United States District Judge